IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MIDWEST CUSTOM CASE, INC., | ) | |
| | ) | |
| Plaintiff-counterdefendant, | ) | |
| | ) | Case No. 08 CV 844 |
| v. | ) | |
| | ) | Honorable Charles R. Norgle, Sr. |
| ADVANCED RECYCLING EQUIPMENT, | ) | Magistrate Judge Cole |
| INC. | ) | |
| | ) | |
| Defendant-counterplaintiff. | ) | |

## ADVANCED RECYCLING EQUIPMENT, INC.'S ANSWER
## TO MIDWEST CUSTOM CASE, INC.'S COMPLAINT AT LAW,
## AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

ADVANCED RECYCLING EQUIPMENT, INC. ("ARE"), by its attorneys, for its

Answer to Midwest Custom Case, Inc.'s ("Midwest") Complaint At Law ("Complaint"), for its

Affirmative Defenses thereto, and for its Counterclaims against Midwest, states as follows:

## ANSWER

### STATEMENT OF JURISDICTION

1.      MIDWEST is incorporated under the laws of the State of Illinois, having its
principal place of business in University Park, Illinois.

**ANSWER:**      ARE lacks knowledge or information sufficient to form a belief about the

truth of the allegations in paragraph 1.

2.      ADVANCED RECYCLING EQUIPMENT, INC. ("A.R.E."), upon information
and belief, is incorporated under the laws of the State of Pennsylvania, having its principal place
of business in St. Mary's, Pennsylvania.

**ANSWER:**      ARE admits the allegations in paragraph 2.

3.      The matter in controversy exceeds, exclusive of costs and interest, the sum of
$75,000.

**ANSWER:**      ARE admits the allegations in paragraph 3.

4.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332, given that it is a civil action between citizens of different states, the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs, and venue is proper as this Court is the District Court of the United States for the district and division encompassing the plaintiff's place of residence.

**ANSWER**:   ARE admits the allegations in paragraph 4.

## COMMON ALLEGATIONS

5.      On February 7, 2007, MIDWEST and A.R.E. entered into a contract for the sale by A.R.E. of a Challenger CCU405-A "Warm Air" Biomass Combustion Unit including Heat Exchanger, Ash Removal Systems, Standard Controls and Single Skin Chimney (the "Challenger Unit") to MIDWEST. (A copy of the contract is attached hereto as Exhibit A.)

**ANSWER:**   ARE admits that on February 7, 2007, ARE and Midwest entered into a

contract (the "Contract") which provided, inter alia, that ARE agreed to sell to Midwest a

Challenger CCU405-A "Warm Air" Combustion Unit including Heat Exchanger, Ash Removal

System, Standard Controls and Single Skin Chimney (24' long) (collectively, the "Challenger

Unit"). ARE admits that a copy of the Contract is attached to the Complaint as Exhibit A. ARE

denies the remaining allegations in paragraph 5.

6.      In addition to the Challenger Unit, the contract also called for the sale of original equipment by A.R.E. to MIDWEST consisting of a Double Damper Assembly with motorized control, the Assembly/Installation of all equipment supplied by A.R.E., Shipping, Auto De-Ash w/Controls & Bin, and 50 Cubic Yard Live Bottom Storage including Transfer Auger ("Optional Equipment").

**ANSWER:**   ARE admits that the Contract provided, inter alia, that ARE also agreed to

provide   the   following:   "Double   Damper   Assembly   w/   Motorized   Control",

"Assembly/Installation of all equipment Supplied by A.R.E.", "Shipping", "Auto De-Ash w/

Controls & Bin", and "50 Cubic Yard Live Bottom Storage  including Transfer Auger," which

items are identified in the Contract as "Optional Equipment."   ARE denies the remaining

allegations in paragraph 6.

7.      The total contract cost of the Challenger Unit was $176,351.00.

**ANSWER:**   ARE admits that the Contract states that the cost of the Challenger Unit (as defined in the answer to paragraph 6) is $176,351.00. ARE denies the remaining allegations in paragraph 7.

8.   The total contract cost of the Optional Equipment was $86,718.00.

**ANSWER:**   ARE admits that the Contract stated that the cost of the Optional Equipment (as defined in the answer to paragraph 7) is $86,718.00. ARE denies the remaining allegations in paragraph 8.

9.   Therefore, the total contract amount was $263,069.00.

**ANSWER:**   ARE admits that, pursuant to the Contract, the cost of the Challenger Unit (as defined in the answer to paragraph 6) plus the cost of the Optional Equipment (as defined in the answer to paragraph 7) is $263,069.00 ARE denies the remaining allegations in paragraph 9.

10.   According to the contract, "50% (of the purchase price) Due with Purchase, Balance Due upon both the equipments arrival to University park, Illinois and verbal approval of customer…" (See Exhibit A, pg. 4.)

**ANSWER:**   ARE admits that the Contract states on page 4, inter alia, as follows:

**TERMS:**   50% Due with Purchase, Balance Due upon equipments arrival to University Park, IL and verbal approval of customer to Balboa Capital. Upon customer request Advanced Recycling Equipment will have two service technicians on site for off loading and setting of all equipment as it arrives.   Advanced Recycling Equipment, Inc. agrees that installation including start-up and commissioning of the system will be provided in a timely manner.

ARE denies the remaining allegations in paragraph 10.

11.   MIDWEST contracted with OFC CAPITAL CORPORATION ("OFC") to finance the sale of the Challenger Unit and Optional Equipment by A.R.E. to MIDWEST.

**ANSWER:**   ARE lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 11.

3

12.     As an accommodation to A.R.E. OFC agreed to vary its practice and make a 50% pre-payment to Advanced as a deposit on the total balance.

**ANSWER:**     ARE admits that OFC, on behalf of Midwest, paid ARE the sum of $131,534.50, which is fifty (50) percent of the total purchase price pursuant to the Contract, on or before May 31, 2007. ARE lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 12.

13.     In reasonable reliance on the contract with A.R.E., MIDWEST authorized OFC to pay A.R.E. the 50% deposit amount of $131,534.50 prior to shipping.

**ANSWER:**     ARE admits that OFC, on behalf of Midwest, paid ARE the sum of $131,534.50, which is fifty (50) percent of the total purchase price pursuant to the Contract, on or before May 31, 2007. ARE lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 13.

14.     OFC, on behalf of Midwest, paid Advanced the 50% deposit amount of $131,534.50 on or before May 31, 2007.

**ANSWER:**     ARE admits that OFC, on behalf of Midwest, paid ARE the sum of $131,534.50, which is fifty (50) percent of the total purchase price pursuant to the Contract, on or before May 31, 2007. ARE denies the remaining allegations in paragraph 14.

15.     According to the contract, delivery of the Challenger Unit and Optional Equipment by A.R.E. to Midwest was to be made approximately 16 weeks after the 50% deposit was received by A.R.E.

**ANSWER:**     ARE admits that the Contract states on page 4, inter alia, as follows:

**DELIVERY:** 16 weeks approx. after deposit is received. (unless in inventory)

ARE denies the remaining allegations in paragraph 15.

16.     Under the "Freight Arrangements" section of the contract, it states that "All equipment sales will be FOB. University Park, IL." (See Exhibit A, pg. 3.)

**ANSWER:**     ARE admits the allegations in paragraph 16.

4

17.     The contract between MIDWEST and A.R.E. further stated that the Challenger Unit and Optional Equipment would be shipped "F.O.B. University Park, IL." (See Exhibit A, pg. 4, Appendix A.)

**ANSWER:**     ARE admits that the Contract states on page 4, inter alia, as follows:

**FOB:** University Park, IL

ARE denies the remaining allegations in paragraph 17.

18.     According to the contract, "Title to the property furnished by Advanced Recycling Equipment is retained until paid in full." (See Exhibit A, pg. 3.)

**ANSWER:**     ARE admits that the Contract states on page 3, inter alia, as follows:

Title to the property furnished by Advanced Recycling Equipment is retained until paid in full.

ARE denies the remaining allegations in paragraph 18.

19.     The contract also stated that "Title to the product(s) and risk of loss or damage shall pass to Purchaser at the f.o.b. point, except that a security interest in the product(s) and proceeds and any replacement shall remain in Company, regardless of mode of attachment to realty or other property, until the full price has been paid in cash." (See Exhibit A, Appendix A.)

**ANSWER:**     ARE admits the allegations in paragraph 19.

20.     According to the contract, "Upon customer request, Advanced Recycling Equipment will have two service technicians on site for off-loading and setting of all equipment as it arrives. Advanced Recycling Equipment, Inc. agrees that installation including start-up and commissioning of the system will be provided in a timely manner." (See Exhibit A, pg. 4.)

**ANSWER:**     ARE admits the allegations in paragraph 20.

21.     Correspondence dated September 25, 2007 from A.R.E. to Midwest stated that "Midwest Customer Case to inspect equipment prior to unloading truck, remaining payment check handed to service tech, then equipment to be unloaded from truck and placed in position and assembly process starts…" (A copy of the September 25, 2007 correspondence is attached hereto as Exhibit B.)

**ANSWER:**     ARE admits that, in a letter from ARE to Midwest dated September 25, 2007, ARE states, inter alia, as follows:

Two A.R.E. technicians to be on site when truck arrives, Midwest Customer Case to inspect equipment prior to unloading truck, **remaining payment check**

**handed to service tech, then equipment to be unloaded from truck** and placed in position and assembly process starts…. (Emphasis in original.)

ARE admits that a copy of the September 25, 2007 correspondence is attached to the

Complaint as Exhibit B. ARE denies the remaining allegations in paragraph 21.

22.    In correspondence dated October 4, 2007, and as part of the agreement between MIDWEST and A.R.E., MIDWEST and A.R.E. agreed that MIDWEST and OFC "will visually inspect the Challenger warm air combustion unit upon arrival and uncrating at its destination of 425 Crossings Dr in University Park, IL scheduled for Tuesday October 9, 2007. It is agreed that once that takes place and once Mr. Cladis (of MIDWEST) gives his verbal approval to release funds, OFC Capital Corporation will remit the remaining balance due ARE, Inc. The funds will be wired or overnighted as outlined in your invoice." (A copy of the October 4, 2007 correspondence is attached hereto as Exhibit C.)

**ANSWER:**    ARE admits that, on or before October 4, 2007, ARE and Midwest agreed

as follows:

OFC Capital Corporation (Lessor) or its assigns and Mark Cladis of Midwest Custom Case (Lessee) will visually inspect the Challenger warm air combustion unit upon arrival and uncrating at its destination of 425 Crossings Dr in University Park, IL scheduled for Tuesday October 9, 2007. It is agreed that once that takes place and once Mr. Cladis gives his verbal approval to release funds, OFC Capital Corporation will remit the remaining balance due ARE, Inc. The funds will be wired or overnighted as outlined in [ARE's] invoice.

ARE admits that the foregoing agreement was stated in an e-mail dated October 4, 2007,

apparently from Davis Kirby, Vice President of Broker Relations, OFC Capital, to Herb Spanier

("Spanier"), of Sunbelt Lessors, Inc., which was apparently forwarded by Spanier, on or about

October 5, 2007, to the e-mail address "jbareinc@alltel.net." ARE admits that a copy of said e-

mails is attached to the Complaint as Exhibit C. ARE denies the remaining allegations in

paragraph 22.

23.    On or about October 9, 2007, A.R.E. shipped the Challenger Unit and Optional Equipment to Midwest's facility in University Park, IL via a third-party shipper.

**ANSWER:**    ARE admits that ARE caused the Challenger Unit and Optional Equipment

to be transported by a third-party shipper to Midwest's facility in University Park, Illinois and

6

said shipment arrived at said location on October 9, 2007. ARE denies the remaining allegations

in paragraph 23.

24.     Upon arrival in University Park, Illinois, and pursuant to the contract and 810
ILCS 5/2-513, MIDWEST and OFC attempted to inspect the Challenger Unit and Optional
Equipment before paying the remaining balance of $131,534.50.

**ANSWER:**     ARE denies the allegations in paragraph 24.

25.     A.R.E. refused to allow the inspection of the Challenger Unit and Optional
Equipment until after the remaining balance was paid.

**ANSWER:**     ARE denies the allegations in paragraph 25.

26.     MIDWEST, due to A.R.E.'s failure to fulfill its obligations under the contract by
refusing to allow the inspection of the Challenger Unit and Optional Equipment, did not give
verbal approval to its finance company for the payment of the remaining balance.

**ANSWER:**     ARE admits that Midwest did not give verbal approval to its finance

company for the payment of the remaining balance that Midwest owed to ARE pursuant to the

Contract. ARE denies the remaining allegations in paragraph 26.


27.     Thereafter, A.R.E. refused to tender the Challenger Unit and Optional Equipment
to MIDWEST and ordered the third-party shipper to leave MIDWEST's facility in University
Park, Illinois with the Challenger Unit and Optional Equipment.

**ANSWER:**     ARE denies the allegations in paragraph 27.

28.     MIDWEST duly performed all of the conditions under its contract with A.R.E. to
be performed, including payment the $131,534.50 deposit amount to A.R.E.

**ANSWER:**     ARE admits that ARE was paid $131,534.50, by or on behalf of Midwest,

which amount is fifty (50) percent of the amount that Midwest owed to ARE pursuant to the

Contract. ARD denies the remaining allegations in paragraph 28.

29.     The Illinois Uniform Commercial Code, 810 ILCS 5/2-513, states that "Unless
otherwise agreed and subject to subsection (3), where goods are tendered or delivered or
identified to the contract for sale, the buyer has a right before payment or acceptance to inspect
them at any reasonable place and time and in any reasonable manner. When the seller is required
or authorized to send the goods to the buyer, the inspection may be after their arrival."

**ANSWER:**    ARE admits that paragraph 29 quotes 810 ILCS 5/2-513(1). ARE denies

that paragraph 29 quotes 810 ILCS 5/2-513 in its entirety. ARE denies that Illinois law applies

to the construal of the Contract and further states that the Contract expressly provided as follows:

"This agreement shall be construed under the laws of the Commonwealth of Pennsylvania.".

(See Complaint, Exhibit A, page 4). ARE further states that the Contract expressly and

specifically sets forth the parties' agreement with respect to the seller's tender of delivery, the

buyer's inspection, and the buyer's payment; accordingly, even if Illinois law applied here, the

provisions of 810 ILCS 5/2-513(1) would not apply.

## COUNT I

## BREACH OF CONTRACT

1-29.    The Plaintiff herein restates and realleges paragraphs 1 through 29 of the
Statement of Jurisdiction and Common Allegations as stated above as paragraphs 1 through 29 of
Count I of its Complaint at Law as though fully set forth herein.

**ANSWER:**    ARE repeats and realleges its answers to paragraphs 1 through 29 of the

Statement of Jurisdiction and Common Allegations as its answers to paragraphs 1 through 29 of

Count I.

30.    MIDWEST has fulfilled all of it's (sic) contractual obligations.

**ANSWER:**    ARE denies the allegations of paragraph 30.

31.    A.R.E. has failed and refused to perform the terms of the contract by not
tendering and allowing the inspection of the Challenger Unit and Optional Equipment in
violation of the contract and the Illinois Uniform Commercial Code.

**ANSWER:**    ARE denies the allegations of paragraph 31.

32.    By reason of the breach said contract, the plaintiff has sustained damages for the
lack of use and possession of the Challenger Unit and Optional Equipment from October 9, 2007
through the filing of this action.

**ANSWER:**    ARE denies the allegations in paragraph 32.

WHEREFORE, Defendant-counterplaintiff ARE prays that the Court enter judgment on

Count I of the Complaint in favor of ARE and against Midwest, that the Court grant no relief

whatsoever to Midwest on Count I of the Complaint, that the Court grant ARE an award of its

reasonable attorneys' fees and costs, and that the Court Grant ARE such other or additional relief

as the Court deems just and equitable.

## COUNT II

### SPECIFIC PERFORMANCE

1-29.   The Plaintiff herein restates and realleges paragraphs 1 through 29 of the
Statement of Jurisdiction and Common Allegations as stated above as paragraphs 1 through 29 of
Count I of its Complaint at Law as though fully set forth herein.

**ANSWER:**   ARE repeats and realleges its answers to paragraphs 1 through 29 of the

Statement of Jurisdiction and Common Allegations as its answers to paragraphs 1 through 29 of

Count II.

30.   A.R.E. has failed and refused to perform the terms of the contract by not
tendering and allowing the inspection of the Challenger Unit and Optional Equipment in
violation of the contract and the Illinois Uniform Commercial Code

**ANSWER:**   ARE denies the allegations in paragraph 30.

WHEREFORE, Defendant-counterplaintiff ARE prays that the Court enter judgment on

Count II of the Complaint in favor of ARE and against Midwest, that the Court grant no relief

whatsoever to Midwest on Count II of the Complaint, that the Court grant ARE an award of its

reasonable attorneys' fees and costs, and that the Court Grant ARE such other or additional relief

as the Court deems just and equitable.

## COUNT III

### UNJUST ENRICHMENT

1-29.   The Plaintiff herein restates and realleges paragraphs 1 through 29 of the
Statement of Jurisdiction and Common Allegations as stated above as paragraphs 1 through 29 of
Count III of its Complaint at Law as though fully set forth herein.

9

**ANSWER:**   ARE repeats and realleges its answers to paragraphs 1 through 29 of the Statement of Jurisdiction and Common Allegations as its answers to paragraphs 1 through 29 of Count III.

30.   As such, A.R.E. is in possession of both the Challenger Unit/Optional Equipment and the $131,534.50 deposit payment.

**ANSWER:**   ARE admits that ARE is in possession of the Challenger Unit, the Optional Equipment and the $131,534.50 deposit payment.   ARE denies the remaining allegations of paragraph 30.

31.   Therefore, A.R.E. has been unjustly enriched in the amount of the $131,534.50 deposit payment.

**ANSWER:**   ARE denies the allegations in paragraph 31.

WHEREFORE, Defendant-counterplaintiff ARE prays that the Court enter judgment on Count III of the Complaint in favor of ARE and against Midwest, that the Court grant no relief whatsoever to Midwest on Count III of the Complaint, that the Court grant ARE an award of its reasonable attorneys' fees and costs, and that the Court Grant ARE such other or additional relief as the Court deems just and equitable.

## AFFIRMATIVE DEFENSES

### Facts

1.   On or about February 7, 2007, ARE and Midwest entered into a certain contract (the "Contract") which provided, inter alia, that ARE would sell certain goods, and provide certain services, to Midwest, in return for certain payments by Midwest, as follows (and as set forth more fully in the Contract):

10

Challenger CCU405-A "Warm Air" Combustion Unit including Heat Exchanger, Ash Removal System, Standard Controls and Single Skin Chimney (24' long) (collectively, the "Challenger Unit"):      $176,351.00

Optional Equipment:
Double Damper Assembly w/ Motorized Control: $4,798.00
Assembly/Installation of all equipment Supplied by A.R.E.:$10,000.00
Shipping:      $4,095.00
Auto De-Ash w/ Controls & Bin:      $11,625.00
50 Cubic Yard Live Bottom Storage  including Transfer Auger: $56,200.00
* Start-up, Commissioning and Training are included in this package

See Contract, a true and correct copy of which is attached hereto as Exhibit A and incorporated

herein by reference.

2.      The Contract expressly provided that certain items were excluded from the scope

of the Contract, including, inter alia, construction of a building to house the Challenger Unit and

Optional Equipment and electrical service necessary to operate the Challenger Unit and Optional

Equipment, as follows:

**The  following scope of supply is excluded from this proposal:**

* Building as required and site preparations required for installation, including all foundation work, electrical, plumbing etc.

See Exhibit A, Contract at 3.

3.      The Contract set forth certain terms and conditions of the sale, including, inter

alia, the following

Title to the property furnished by Advanced Recycling Equipment is retained until paid in full. *** This agreement shall be construed under the laws of the Commonwealth of Pennsylvania.  Signing this contract verifies that you agree to the Terms and Conditions of Sale in the attached Appendix A.

See Exhibit A, Contract at 3.

4      The Contract set forth the applicable freight arrangements, as follows:

All equipment sales will be **FOB University Park, IL.** (emphasis in original)

See Exhibit A, Contract at 3.

5.    The Contract set forth certain terms, as follows:

50% Due with Purchase, Balance Due upon equipment arrival to University
Park, IL and verbal approval of customer to Balboa Capital. Upon customer
request Advanced Recycling Equipment will have two service technicians on
site for off loading and setting of all equipment as it arrives.   Advanced
Recycling Equipment, Inc. agrees that installation including start-up and
commissioning of the system will be provided in a timely manner.

See Exhibit A, Contract at 4.

6.    Appendix A set forth certain additional terms and conditions of the sale,

including, inter alia, with respect to title and insurance, as follows:

**TITLE AND INSURANCE** – Title to the product(s) and risk of loss or damage
shall pass to Purchaser at the f.o.b. point, except that a security interest in the
product(s) and proceeds and any replacement shall remain in Company,
regardless of the mode of attachment to realty or other property, until the full
price has been paid in cash.

See Exhibit A, Contract at 4.

7.    Appendix A set forth certain additional terms and conditions of the sale,

including, inter alia, with respect to attorneys' fees and costs, as follows:

In the event Company places this agreement in the hands of an attorney for
collection of the purchase price or other sums owing to Company from
Purchaser or whoever holds title to equipment purchased, Purchaser agrees to
pay Company's reasonable costs and expenses of collection, including
attorney's fees, whether or not suite or action is filed and any additional costs,
expenses attorneys' fees incurred at trial or on appeal.

See Exhibit A, Contract, Appendix A.

8.    On or before May 31, 2007, Midwest, or a third-party on behalf of Midwest, paid

ARE the sum of $131,534.50, representing fifty (50) percent of the total purchase price pursuant

to the Contract.

9.    On or about September 25, 2007, ARE sent a letter to Midwest that stated, inter

alia, as follows:

**Plan of attack for installation:**
Two A.R.E. technicians to be on site when truck arrives, Midwest Custom Case
to inspect equipment prior to unloading truck, **remaining payment check
handed to service tech, then equipment to be unloaded from truck** and
placed into position and assembly process starts and continues until complete for
approximately 3 to 4 days and technicians return to St. Marys, PA. (emphasis in
original)

See September 25, 2007 letter from ARE to Midwest, a true and correct copy of which is

attached hereto as Exhibit B and incorporated herein by reference.

10.    On or shortly before October 4, 2007, ARE and Midwest agreed as follows:

OFC Capital Corporation (Lessor) or its assigns and March Cladis of Midwest
Custom Case (Lessee) will visually inspect the Challenger warm air combustion
unit upon arrival and uncrating at its destination of 425 Crossings Dr in
University Park, IL scheduled for Tuesday October 9, 2007. It is agreed that
once that takes place and once Mr. Cladis gives his verbal approval to release
funds, OFC Capital Corporation will remit the remaining balance due ARE, Inc.
The funds will be wired or overnighted as outlined in [ARE's] invoice.

See e-mail from Davis Kirby, Vice President of Broker Relations, OFC Capital, to Herb Spanier

("Spanier"), of Sunbelt Lessors, Inc., forwarded by Spanier, on or about October 5, 2007, to the

e-mail address "jbareinc@alltel.net", a true and correct copy of which is attached hereto as

Exhibit C and incorporated herein by reference.

11.    ARE caused the Challenger Unit and Optional Equipment to be transported by a

third-party shipper to Midwest's facility in University Park, Illinois and said shipment arrived at

said location on October 9, 2007.

12.    On October 9, 2007, ARE had two service technicians on site at Midwest's facility

in University Park, Illinois for off loading and setting of all equipment as it arrived.

13.    On October 9, 2007, upon arrival of the Challenger Unit and Optional Equipment at Midwest's facility in University Park, Illinois, ARE uncrated the Challenger Unit and Optional Equipment to permit visual inspection by Midwest.

14.    On October 9, 2007, upon arrival of the Challenger Unit and Optional Equipment at Midwest's facility in University Park, Illinois, and upon ARE uncrating the Challenger Unit and Optional Equipment for visual inspection by Midwest, Midwest failed and refused to visually inspect the Challenger Unit and Optional Equipment.

15.    On October 9, 2007, upon arrival of the Challenger Unit and Optional Equipment at Midwest's facility in University Park, Illinois, and upon ARE uncrating the Challenger Unit and Optional Equipment for visual inspection by Midwest, Midwest wrongfully stated to ARE that Midwest would not pay or approve payment of the balance of the purchase price for the Challenger Unit and the Optional Equipment until (1) the Challenger Unit and Optional Equipment were fully installed; (2) Midwest completed construction of the building as required and site preparations required for installation of the Challenger Unit and Optional Equipment, including electrical work; and (3) ARE returned for start up of the Challenger Unit and Operational Equipment.

16.    On October 10, 2007, ARE caused the third-party shipper to return with the Challenger Unit and Optional Equipment to Midwest's facility in University Park, Illinois for visual inspection of the Challenger Unit and Optional Equipment by Midwest and delivery of the Challenger Unit and Optional Equipment to Midwest.

17.    On October 10, 2007, Midwest again failed and refused to visually inspect the Challenger Unit and Optional Equipment at its facility in University Park, Illinois.

14

18.    On October 10, 2007, Midwest again wrongfully failed and refused to pay or approve payment of the balance of the purchase price for the Challenger Unit and the Optional Equipment.

## First Affirmative Defense - Waiver

19.    ARE incorporates paragraphs 1-18 of its Affirmative Defenses as if fully set forth herein.

20.    Midwest's failure and refusal to visually inspect the Challenger Unit and Optional Equipment upon their arrival and uncrating at Midwest's facility in University Park, Illinois on October 9, 2007 and/or again on October 10, 2007 constitutes a waiver of Midwest's right to visually inspect the Challenger Unit and Optional Equipment upon their arrival and uncrating at Midwest's facility at University Park, Illinois.

21.    Thus, as of October 9, 2007 and/or October 10, 2007, (1) ARE had performed all of its obligations pursuant to the Contract that entitled ARE to payment of the sum of $131,534.50, which amount was the balance due pursuant to the Contract (from or on behalf of Midwest), and (2) all conditions for said payment had been satisfied or otherwise excused. Accordingly, Midwest's failure and refusal to pay or approve payment to ARE in the amount of $131,534.50 on said date(s) constitutes a material breach of the Contract by Midwest.

## Second Affirmative Defense - Estoppel

19.    ARE incorporates paragraphs 1-18 of its Affirmative Defenses as if fully set forth herein.

20.    Based upon Midwest's failure and refusal to visually inspect the Challenger Unit and Optional Equipment upon their arrival and uncrating at Midwest's facility in University Park, Illinois on October 9, 2007 and/or again on October 10, 2007, Midwest is estopped and/or is

15

equitably estopped from asserting its right to visually inspect the Challenger Unit and Optional Equipment upon their arrival and uncrating at Midwest's facility at University Park, Illinois as a condition of Midwest's obligation to pay and/or to approve payment to ARE of the sum of $131,534.50, which amount was the balance due pursuant to the Contract.

21.     Thus, as of October 9, 2007 and/or October 10, 2007, (1) ARE had performed all of its obligations pursuant to the Contract that entitled ARE to payment of the sum of $131,534.50, which amount was the balance due pursuant to the Contract (from or on behalf of Midwest), and (2) all conditions for said payment had been satisfied or otherwise excused. Accordingly, Midwest's failure and refusal to pay and/or approve payment to ARE in the amount of $131,534.50 on said date(s) constitutes a material breach of the Contract by Midwest.

## Third Affirmative Defense – Anticipatory Repudiation

19.     ARE incorporates paragraphs 1-18 of its Affirmative Defenses as if fully set forth herein.

20.     Midwest's statements to ARE on October 9, 2007, that Midwest would not pay and/or approve payment of the balance of the purchase price for the Challenger Unit and the Optional Equipment until (1) the Challenger Unit and Optional Equipment were fully installed; (2) Midwest completed construction of the building as required and site preparations required for installation of the Challenger Unit and Optional Equipment, including electrical work; and (3) ARE returned for start up of the Challenger Unit and Operational Equipment – none of which items were conditions of Midwest's obligation to pay and/or to approve payment to ARE of the sum of $131,534.50, which amount was the balance due pursuant to the Contract – constitutes an anticipatory repudiation of the Contract.

## Forth Affirmative Defense – Failure To State A Cause Of Action In Count III For Unjust Enrichment

19.     ARE incorporates paragraphs 1-18 of its Affirmative Defenses as if fully set forth herein.

20.     The theory of unjust enrichment is an equitable remedy based upon a contract implied in law.  As an equitable remedy, unjust enrichment is only available where there is no adequate remedy at law.  Otherwise stated, where there is a specific contract that governs the relationship between the parties, the doctrine of unjust enrichment has no application.  While a party may plead claims for breach of contract and unjust enrichment in the alternative, a party is barred from asserting a claim for unjust enrichment if said claim includes allegations of an express contract that governs the relationship of the parties.

21.     In Count III, Midwest asserts a claim based upon the theory of unjust enrichment. However, in paragraphs 1 through 29 of Count III, Midwest restates and realleges paragraphs 1 through 29 of its Statement of Jurisdiction and Common Allegations, in which Midwest alleged an express contract (namely, the Contract) that governs the relationship of the parties.

### Prayer For Relief

WHEREFORE, Defendant-counterplaintiff ARE prays that the Court enter judgment on Counts I-III of the Complaint in favor of ARE and against Midwest, that the Court grant no relief whatsoever to Midwest on Counts I-III of the Complaint, that the Court grant ARE an award of its reasonable attorneys' fees and costs, and that the Court Grant ARE such other or additional relief as the Court deems just and equitable.

### COUNTERCLAIMS

### Parties

1.     ARE is incorporated under the laws of the State of Pennsylvania, and has its principal place of business in St. Marys', Pennsylvania.

17

2.      On information and belief, Midwest is incorporated under the laws of the State of

Illinois, and has its principal place of business in University Park, Illinois.

### Jurisdiction and Venue

3.      This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(1), in that there is

complete diversity between Plaintiff-counterdefendant Midwest and Defendant-counterplaintiff

ARE, and the amount in controversy exceeds $75,000.00.  In addition, this Court has pendant

and/or ancillary jurisdiction over these Counterclaims, as they arise from the same transaction as

Plaintiff-counterdefendant's claims.  Venue is proper under 28 U.S.C. §1301 and 28 U.S.C.

§1391, in that the Plaintiff-counterdefendant resides in this district and a substantial part of the

events and transactions giving rise to the claim occurred in this judicial district.

### Facts

4.      On or about February 7, 2007, ARE and Midwest entered into a certain contract

(the "Contract") which provided, inter alia, that ARE would sell certain goods, and provide

certain services, to Midwest, in return for certain payments by Midwest, as follows (and as set

forth more fully in the Contract):

Challenger CCU405-A "Warm Air" Combustion Unit including Heat
Exchanger, Ash Removal System, Standard Controls and Single Skin Chimney
(24' long) (collectively, the "Challenger Unit"):        $176,351.00

Optional Equipment:
Double Damper Assembly w/ Motorized Control: $4,798.00
Assembly/Installation of all equipment Supplied by A.R.E.:$10,000.00
Shipping:       $4,095.00
Auto De-Ash w/ Controls & Bin:       $11,625.00
50 Cubic Yard Live Bottom Storage  including Transfer Auger: $56,200.00
* Start-up, Commissioning and Training are included in this package

See Contract, a true and correct copy of which is attached hereto as Exhibit A and incorporated

herein by reference.

5.     The Contract expressly provided that certain items were excluded from the scope

of the Contract, including, inter alia, construction of a building to house the Challenger Unit and

Optional Equipment and electrical service necessary to operate the Challenger Unit and Optional

Equipment, as follows:

**The  following scope of supply is excluded from this proposal:**

\*        Building as required and site preparations required for installation, including all foundation work, electrical, plumbing etc.

See Exhibit A, Contract at 3.

6.     The Contract set forth certain terms and conditions of the sale, including, inter

alia, the following

> Title to the property furnished by Advanced Recycling Equipment is retained until paid in full. \*\*\* This agreement shall be construed under the laws of the Commonwealth of Pennsylvania. Signing this contract verifies that you agree to the Terms and Conditions of Sale in the attached Appendix A.

See Exhibit A, Contract at 3.

7.     The Contract set forth the applicable freight arrangements, as follows:

All equipment sales will be **FOB University Park, IL.** (emphasis in original)

See Exhibit A, Contract at 3.

8.     The Contract set forth certain terms, as follows:

> 50% Due with Purchase, Balance Due upon equipment arrival to University Park, IL and verbal approval of customer to Balboa Capital. Upon customer request Advanced Recycling Equipment will have two service technicians on site for off loading and setting of all equipment as it arrives.  Advanced Recycling Equipment, Inc. agrees that installation including start-up and commissioning of the system will be provided in a timely manner.

See Exhibit A, Contract at 4.

9.     Appendix A set forth certain additional terms and conditions of the sale,

including, inter alia, with respect to title and insurance, as follows:

19

**TITLE AND INSURANCE** – Title to the product(s) and risk of loss or damage shall pass to Purchaser at the f.o.b. point, except that a security interest in the product(s) and proceeds and any replacement shall remain in Company, regardless of the mode of attachment to realty or other property, until the full price has been paid in cash.

See Exhibit A, Contract at 4.

    10.    Appendix A set forth certain additional terms and conditions of the sale,

including, inter alia, with respect to attorneys's fees and costs, as follows:

In the event Company places this agreement in the hands of an attorney for collection of the purchase price or other sums owing to Company from Purchaser or whoever holds title to equipment purchased, Purchaser agrees to pay Company's reasonable costs and expenses of collection, including attorney's fees, whether or not suite or action is filed and any additional costs, expenses attorneys' fees incurred at trial or on appeal.

See Exhibit A, Contract, Appendix A.

    11.    On or before May 31, 2007, Midwest, or a third-party on behalf of Midwest, paid

ARE the sum of $131,534.50, representing fifty (50) percent of the total purchase price pursuant

to the Contract.

    12.    On or about September 25, 2007, ARE sent a letter to Midwest that stated, inter

alia, as follows:

**Plan of attack for installation:**
Two A.R.E. technicians to be on site when truck arrives, Midwest Custom Case to inspect equipment prior to unloading truck, **remaining payment check handed to service tech, then equipment to be unloaded from truck** and placed into position and assembly process starts and continues until complete for approximately 3 to 4 days and technicians return to St. Marys, PA. (emphasis in original)

See September 25, 2007 letter from ARE to Midwest, a true and correct copy of which is

attached hereto as Exhibit B and incorporated herein by reference.

    13.    On or shortly before October 4, 2007, ARE and Midwest agreed as follows:

OFC Capital Corporation (Lessor) or its assigns and March Cladis of Midwest
Custom Case (Lessee) will visually inspect the Challenger warm air combustion
unit upon arrival and uncrating at its destination of 425 Crossings Dr in
University Park, IL scheduled for Tuesday October 9, 2007. It is agreed that
once that takes place and once Mr. Cladis gives his verbal approval to release
funds, OFC Capital Corporation will remit the remaining balance due ARE, Inc.
The funds will be wired or overnighted as outlined in [ARE's] invoice.

See e-mail from Davis Kirby, Vice President of Broker Relations, OFC Capital, to Herb Spanier

("Spanier"), of Sunbelt Lessors, Inc., forwarded by Spanier, on or about October 5, 2007, to the

e-mail address "jbareinc@alltel.net", a true and correct copy of which is attached hereto as

Exhibit C and incorporated herein by reference.

14.     ARE caused the Challenger Unit and Optional Equipment to be transported by a

third-party shipper to Midwest's facility in University Park, Illinois and said shipment arrived at

said location on October 9, 2007.

15.     On October 9, 2007, ARE had two service technicians on site at Midwest's facility

in University Park, Illinois for off loading and setting of all equipment as it arrived.

16.     On October 9, 2007, upon arrival of the Challenger Unit and Optional Equipment

at Midwest's facility in University Park, Illinois, ARE uncrated the Challenger Unit and Optional

Equipment to permit visual inspection by Midwest.

17.     On October 9, 2007, upon arrival of the Challenger Unit and Optional Equipment

at Midwest's facility in University Park, Illinois, and upon ARE uncrating the Challenger Unit

and Optional Equipment for visual inspection by Midwest, Midwest failed and refused to visually

inspect the Challenger Unit and Optional Equipment.

18.     On October 9, 2007, upon arrival of the Challenger Unit and Optional Equipment

at Midwest's facility in University Park, Illinois, and upon ARE uncrating the Challenger Unit

and Optional Equipment for visual inspection by Midwest, Midwest wrongfully stated to ARE

that Midwest would not pay or approve payment of the balance of the purchase price for the Challenger Unit and the Optional Equipment until (1) the Challenger Unit and Optional Equipment were fully installed; (2) Midwest completed construction of the building as required and site preparations required for installation of the Challenger Unit and Optional Equipment, including electrical work; and (3) ARE returned for start up of the Challenger Unit and Operational Equipment.

19.     On October 10, 2007, ARE caused the third-party shipper to return with the Challenger Unit and Optional Equipment to Midwest's facility in University Park, Illinois for visual inspection of the Challenger Unit and Optional Equipment by Midwest and delivery of the Challenger Unit and Optional Equipment to Midwest.

20.     On October 10, 2007, Midwest again failed and refused to visually inspect the Challenger Unit and Optional Equipment at its facility in University Park, Illinois.

21.     On October 10, 2007, Midwest again wrongfully failed and refused to pay or approve payment of the balance of the purchase price for the Challenger Unit and the Optional Equipment.

22.     ARE has performed all of its obligations entitling ARE to payment of the balance of $131,534.50 pursuant to the Contract, and has satisfied all conditions not otherwise excused to said payment.

23.     At all relevant times, ARE was, and is, ready, willing and able to perform its remaining obligations pursuant to the Contract, but for Midwest's breach of and anticipatory repudiation of the Contract.

22

24. By its conduct alleged herein, Midwest has breached its payment obligation pursuant to the Contract and has breached the Contract by its anticipatory repudiation of the Contract.

25. As a direct and proximate result of Midwest's breach of and anticipatory repudiation of the Contract, ARE has suffered, and will continue to suffer, damages, including, but not limited to, the following:

(A)   ARE's costs to manufacture the Challenger Unit and Optional Equipment;

(B)   Fees to store the Challenger Unit and Optional Equipment upon their unanticipated return from Illinois;

(C)   Shipping costs to transport the Challenger Unit and Optional equipment back from Illinois;

(D)   Expenses associated with the staff that ARE sent to Illinois to assemble and hook-up the equipment once off-loaded from the delivery trucks, which staff spent two days in Illinois waiting for Midwest to visually inspect the Challenger Unit and Optional Equipment, only to ultimately return without having hooked up the equipment;

(E)   Interest accumulating on the unpaid balance of the purchase price of $131,534.50;

(F)   Legal fees incurred as a result of having to defend and prosecute this action; and

(G)   The remaining payment which is required under the contract in the amount of $131,534.50.

### Count I: Breach Of Contract

23

26.     ARE incorporates paragraphs 1-25 of its Counterclaims as if fully set forth in Count I of its Counterclaims.

27.     The Contract is a valid and enforceable agreement between ARE and Midwest.

28.     As set forth above, ARE has performed all of its obligations entitling ARE to payment of the balance of $131,534.50 pursuant to the Contract, and has satisfied all conditions not otherwise excused to said payment.

29.     At all relevant times, ARE was, and is, ready, willing and able to perform its remaining obligations pursuant to the Contract, but for Midwest's breach of and anticipatory repudiation of the Contract.

30.     As set forth above, Midwest has breached its payment obligation pursuant to the Contract and has breached the Contract by its anticipatory repudiation of the Contract.

31.     As set forth above, as a direct and proximate result of Midwest's breach of and anticipatory repudiation of the Contract, ARE has suffered, and will continue to suffer, damages.

#### Prayer For Relief

WHEREFORE, Defendant-counterplaintiff Advanced Recycling Equipment, Inc., Defendant prays that the Court to enter judgment in its favor, and against Plaintiff-counterdefendant Midwest Custom Case, Inc., on Defendant's Counterclaim in an amount in excess of the jurisdictional limit of $75,000.00, award Defendant-counterplaintiff its reasonable attorneys' fees and costs, and grant Defendant-counterplaintiff such other or additional relief as the Court deems just and equitable.

#### Count II: Specific Performance

26.     ARE incorporates paragraphs 1-25 of its Counterclaims as if fully set forth in Count II of its Counterclaims.

24

27.    Midwest has failed and refused to perform the terms of the Contract by not paying and/or approving payment in the amount of $131,534.50.

28.    ARE remains ready, willing and able to perform its remaining obligations pursuant to the Contract, but for Midwest's breach of and anticipatory repudiation of the Contract.

## Prayer For Relief

WHEREFORE, Defendant-counterplaintiff Advanced Recycling Equipment, Inc., Defendant prays that the Court enter judgment in its favor, and against Plaintiff-counterdefendant Midwest Custom Case, Inc., directing for specific performance of the Contract, such that Defendant agrees to deliver the Challenger Unit and Optional Equipment once again to Plaintiff's facility, and to once again uncover and unstrap the equipment to make it available for Plaintiff's inspection. Provided, however, that upon inspection Plaintiff is Ordered to tender remaining payment as required by the contract, and also provided that the Court retains jurisdiction over the other damages set forth herein.

Respectfully submitted,

ADVANCED RECYCLING EQUIPMENT, INC.

By:___/s/ William Ejzak_____
     One of its attorneys

William M. Ejzak
ARDC # 6206836
**BROWN, UDELL & POMERANTZ, LTD.**
1332 North Halsted Street – Suite 100
Chicago, Illinois 60622
Ph.: (312) 475-9900
Fax: (312) 475-1188